GARY Y. LEUNG (Cal. Bar No. 302928)
Email:  leungg@sec.gov
PETER DEL GRECO (Cal. Bar No. 164925)
Email:  delgrecop@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy Jane Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No.  5:19-cv-958 |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| DANIEL PACHECO, | |
| Defendant, and | |
| EPROFIT SYSTEMS LLC, MATTHEW LOPEZ, FINTACT SOLUTIONS GROUP LLC, FINTACT PAYMENT SOLUTIONS LLC, MARITUS REGALIS LLC, GABTTA LLC, and TRIDENT COMMERCE LLC, | |
| Relief Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.      Defendant has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district, and because Defendant resides in this district.

## SUMMARY

4.      This enforcement action concerns defendant Daniel Pacheco's fraudulent and unregistered offering of securities through his multilevel marketing company, IPro.  From January 2017 through March 2018, Pacheco and IPro raised more than $26.5 million from investors nationwide through the sale of "IPro packages."  These packages contained instructional materials on how to profitably engage in e-commerce, and provided purchasers with a recruitment-based compensation plan and the ability to convert "points" into a digital asset, or cryptocurrency, that IPro was disseminating to the public through the sale of its packages.  Points were awarded both as a rebate on the purchase of packages and as a separate bonus for the recruitment of others to IPro.

5.      The cryptocurrency was called "PRO Currency", and Pacheco

represented to IPro investors that IPro would create an ecosystem in which e-commerce would be conducted in PRO Currency-based transactions, thus providing PRO Currency with substantial long term value.

6.     IPro, however, was a fraudulent pyramid scheme.  Crucially, Pacheco misallocated and misappropriated substantial amounts of investor funds to the point that IPro had insufficient funds to honor its obligations under the recruitment compensation plan that had enticed investors to join the IPro program.  Among other things, Pacheco used IPro funds to purchase a multi-million dollar house, transfer millions of dollars to entities controlled by him, and buy a Rolls Royce for his personal use.  Thus, despite its promises to investors, IPro lacked funds to pay promised commissions and bonuses and the pyramid scheme accordingly collapsed in March 2018.

7.     By engaging in a fraudulent scheme through IPro's offer and sale of its packages, Pacheco violated the antifraud provisions of Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, as well as the securities offering registration provisions of Section 5 of the Securities Act.

8.     The SEC seeks permanent injunctions prohibiting future violations of the federal securities laws and an order requiring defendant and the relief defendants to disgorge their ill-gotten gains, along with pre-judgment interest, and imposing a civil penalty on the defendant.

## DEFENDANT

9.     Defendant Daniel Pacheco, age 45, is a resident of San Clemente, California.  He was the sole member of IPro Solutions LLC and IPro Network LLC, two California limited liability companies that Pacheco formed on or about June 2017 (collectively, "IPro").  IPro is now defunct.  Pacheco is also the sole member of relief defendant E Profit Systems LLC, another California limited liability company that Pacheco formed in October 2017.  Neither Pacheco nor IPro have been registered

with the SEC in any capacity.

## RELIEF DEFENDANTS

10.     Relief Defendant E Profit Systems LLC is a California limited liability company that is located in Irvine, California.  E Profit Systems LLC is not registered with the SEC in any capacity.

11.     Relief Defendant Matthew Lopez, age 43, is a resident of Phoenix, Arizona.  He is the co-managing member of relief defendants Fintact Payment Solutions LLC, Fintact Solutions Group, and Trident Commerce LLC, and the sole managing member of relief defendants Maritus Regalis LLC and Gabtta LLC.  Lopez has never been registered with the SEC in any capacity.

12.     Relief Defendant Fintact Payment Solutions LLC was a Wyoming limited liability company that relief defendant Lopez formed in December 2016. Fintact Payment Solutions LLC was located in Las Vegas Nevada, but is now defunct.  Fintact Payment Solutions LLC was not registered with the SEC in any capacity.

13.     Relief Defendant Fintact Solutions Group LLC was a Wyoming limited liability company that relief defendant Lopez formed in March 2017 and is now defunct.

14.     Relief Defendant Maritus Regalis LLC is a Nevada limited liability company that relief defendant Lopez formed in December 2016.  Maritus Regalis LLC is located in Las Vegas, Nevada and is not registered with the SEC in any capacity.

15.     Relief Defendant Gabtta LLC is a Wyoming limited liability company that relief defendant Lopez formed in December 2016.  Gabtta LLC is located in Las Vegas, Nevada and is not registered with the SEC in any capacity.

## FACTUAL ALLEGATIONS

**A.     The IPro Packages**

16.     IPro began operations in early 2017, when it started an investment

program that offered on-line instructional materials – the IPro packages – for sale. These materials purported to educate purchasers on how to establish and operate a successful e-commerce business.

17.    For an additional $50 annual activation fee, purchasers of IPro packages could also become what IPro called "active members" of IPro, with the potential to become "independent sales associates" or "premium independent sales associates" of IPro (collectively, "IPro members").

18.    From its inception in 2017 through March 2018, IPro's membership grew rapidly, reaching approximately 20,000 members and raising at least $26.5 million through the sale of its packages in less than a year-and-a-half.

19.    IPro claims that it operates a legitimate multilevel marketing enterprise ("MLM") and that its customers are motivated only by a desire to purchase IPro's e-commerce instructional materials.

20.    The e-commerce instructional materials, however, were not the sole or even most salient component of the IPro packages.

21.    First, for a $50 activation fee, purchasers of the IPro packages also gained the right to participate in IPro's "iPN Compensation Plan" and earn compensation through the recruitment of other members to IPro.

22.    In addition, purchasers of the IPro packages received rebate rewards and recruitment bonuses in the form of a cryptocurrency – PRO Currency – which, according to Pacheco and IPro, also had the potential to increase in value.

23.    Thus, there were three ways purchasers of the IPro packages could potentially make money:  (i) by putting into effect the e-commerce lessons taught in the IPro packages' instructional materials and starting an online retail business; (ii) by paying the $50 activation fee, becoming an IPro member, and then recruiting new members to IPro who would buy packages, who would in turn recruit others new members to IPro, and so on; and (iii) by converting rewards points – earned when purchasing IPro packages and when recruiting others to IPro – into PRO Currency,

1    with the hope that that the cryptocurrency would appreciate in value.

2             **1.**     **IPro's Recruitment Compensation Plan**

3       24.     When purchasers of IPro packages paid a $50 activation fee, those

4 purchasers were eligible under IPro's "iPN Compensation Plan" to earn a "Direct

5 Sales Bonus," "10% Binary Bonus," "Matching Bonus," and "Leadership Bonus" as

6 an "Independent Sales Associate" of IPro, or IPro member.

7       25.     To earn these bonuses under the iPN Compensation Plan, IPro members

8 recruited new members to IPro.

9       26.     In a marketing presentation entitled "What is iPro Network?" that was

10 published on the internet in or around February 2017, Pacheco described the iPN

11 Compensation Plan as follows, emphasizing the income that purchasers of IPro

12 packages could earn by recruiting new IPro members, who would in turn, through

13 multiple "levels" of recruitment, bring additional members to IPro:

14          So this is a very, very simple compensation plan, but it's

15          extremely generous. So let me break it down this way. Now I've
         been, like I said, just shy of 11 years in the [multi-level marketing]

16          industry, and one of the things that I like the most is always

17          having fast cash, being able to make money today. And with this
         program, there's five different levels of membership. There [are]

18          $100, $500, $1,500, $2,500, and $5,500.

19       27.     In the video posted on the internet, Pacheco described the iPN

20 Compensation Plan's "direct sales bonus" as follows:

21          Now there's a 10% direct sale bonus on any package sold directly

22          by you.

23       28.     Pacheco also described the iPN Compensation Plan's "binary bonus" in

24 the video:

25          Now the binary bonus. Now, folks, I love the binary. I've been in

26          the binary since day one, and I absolutely love the binary and
         here's the reason why … You can earn from you down to infinity

27          with no levels to qualify. You get to override every single

28          person's volume in your organization, including spillover,

COMPLAINT          6

including the volume that I get just for being in a good, strong team where people are placing people below me even though I didn't put them there. And so that is huge because you get to override everything and 10 percent of your weaker team volume is what you're going to get … Now I've been – I made seven figures – multiple companies, multiple times in this industry because of the binary.

29. As for the iPN Compensation Plan's "matching bonus," Pacheco stated in the video that:

So we have the matching bonus, and the matching bonus works this way … You could literally max out our compensation plan going as wide as you want to go four levels deep on the matching bonuses. And then on the binary you could go to unlimited depth. So you have the best of both worlds. But this isn't one of those weak compensation plans where they give you like 10% first level, then next level you go to five [percent], then the third level you go to like 1 percent, and then you go to like – you have .25 [percent] the deeper you go, the less and less and less you get paid. This is 10 [percent], 10 [percent], 20 [percent], 20 [percent], very, very easy, very profitable, very generous compensation plan on the matching bonuses.

30. Finally, Pacheco described the iPN Compensation Plan's "leadership bonus" in the video as follows:

[I]t doesn't stop there. We have our leadership rank bonus. Now this is huge, guys, because if you understand leadership advancement, you're going to find out that this is where the big, big money is made … This is life-changing income, folks. When you go through the leadership ranks and actually get to override your entire team's volume, this is huge.

31. As reflected in IPro's marketing materials, the recruitment bonuses available through the iPN Compensation Plan were in fact an important part of a purchaser's decision to buy an IPro package, and they were marketed as such.

32. A majority of the individuals who purchased IPro's packages paid the $50 activation fee, which allowed them to earn recruitment bonuses through IPro's

1  iPN Compensation Plan.

2      33.    In addition, many IPro members bought multiple packages, packages

3  that would be superfluous if not for the additional points awarded in the form of

4  rebate rewards.

5      34.    Accordingly, IPro members did not purchase IPro packages solely for

6  the e-commerce instructional materials.  Rather, purchasers of IPro packages were

7  paying money to IPro in exchange for the right to sell IPro packages on their own, as

8  well as the right to receive compensation for recruiting other participants to the

9  investment program, recruitment compensation that was not related to the sale of the

10  e-commerce educational component of the packages to someone actually interested in

11  using those materials.

12      **2.    IPro's Cryptocurrency Rewards Program**

13      35.    On or about early-2017, a third-party doing business as PRO Commerce

14  created and began issuing a digital asset called PRO Currency.

15      36.    According to Pacheco, PRO Currency is a cryptocurrency.

16      37.    PRO Commerce claims that PRO Currency is based on an open-source

17  blockchain, or distributed ledger of transactions, that is developed through the "proof-

18  of-stake" method of transaction validation.

19      38.    "Proof-of-stake" validation for the PRO Currency blockchain, as

20  described by PRO Commerce, occurred whenever a transacting party's computer

21  connected to a decentralized computer network, with validation occurring in the

22  transacting party's online "wallet."

23      39.    In 2017, PRO Commerce arranged for PRO Currency to trade on several

24  public digital asset exchanges.

25      40.    PRO Commerce transferred more than 200 million PRO Currency coins

26  to IPro in 2017-2018.

27      41.    In exchange for creating PRO Currency and providing IPro with more

28  than 200 million PRO Currency coins, IPro transferred about $415,000 to PRO

COMPLAINT                8

Commerce from February to October 2017.

42.   IPro then disseminated those PRO Currency coins to purchasers of IPro packages in the form of rewards rebates and recruitment bonuses.

43.   Specifically, as an incentive to purchase its packages, IPro provided package purchasers with PRO Reward Points in an amount equal to or greater than the cost of the IPro package purchased, depending on the price of the package, with those points being convertible into PRO Currency.

44.   In addition, IPro also paid recruitment bonuses to its members in the form of points, with each point being worth $1.  IPro members could later redeem up to 70% of their recruitment bonus points for a cash payout from IPro.  As for the remaining 30% of their recruitment bonus points, those points were convertible into a "coin back reward," which they received in the form of PRO Currency.

45.   The opportunity to earn rebate rewards and recruitment bonuses in the form of a digital asset, or cryptocurrency, was a further enticement for those interested in participating in IPro's investment program.

46.   In his "What is iPro Network?" online presentation, published on or about February 27, 2017, Pacheco explicitly analogized PRO Currency to Bitcoin, another cryptocurrency that was the object of significant investor interest in 2017. After explaining that PRO Currency's current market value was 2.5 cents per coin, Pacheco explained:

> Now think about this, okay?  Seven years ago, Bitcoins were worth nothing.  But today they're worth 900.  Now let's say these [PRO Currency] coins in seven years are not worth $900.  Let's say they were only worth a dollar.  Would you be upset?  Let me see that by a show of hands?  Would anybody be upset? … Now what if they went to $2.  Would you be happy?  Okay, I see a lot of hands going up, yes, yes, yes, yes.  Now who would be unhappy?  (Laughter.)  Well, I don't think anybody would be unhappy.

47.   Pacheco and IPro also organized IPro-sponsored member events, and

arranged for a celebrity endorser to market the investment aspects of PRO Currency at several of these events taking place across the country in 2017.

48.    According to that endorser:

> Now, obviously, we've seen so many new ideas it's rare that one stands out and captivates my attention.  But I'm here to tell you that I think I've come across something that could become one of the most profitable opportunities I've ever been involved with. This is the space of digital currency, what's commonly referred to as cryptocurrency … These are coins.  And the values in this cryptocurrency market are exploding all over the place and people are winning big time.  But this industry has been waiting for a new currency to emerge, one that possesses the capability to transact at lightning speeds, one that has one of the most sophisticated securities available today.  Now, ladies and gentlemen, I'd like to introduce you to PRO Currency …"

49.    IPro posted video of these events online and Pacheco approved the statements made during these promotional events prior to their publication on the internet.

50.    It was Pacheco who came up with the idea to implement a rewards program that was not just cash back, but also allowed purchasers of IPro packages to redeem their rewards points for a cryptocurrency.

51.    As he put it:  "Crypto right now is a new thing that people like.  And from a marketing stand point, it gives … a little bit of a sizzle that nobody else has." The cryptocurrency "angle" for IPro multi-level marketing packages put IPro "ahead of the curve" and made their product more attractive to purchasers.

52.    The value of PRO Currency acquired through rebate rewards or recruitment bonuses, however, was dependent on Pacheco's and IPro's ability to generate users of the coin; in other words, finding a segment of the market that would "interact" with PRO Currency, by using the coin to conduct e-commerce transactions.

53.    Pacheco described this as "usability."  Without usability, PRO Currency coins had no value.

COMPLAINT                                    10

54.     In his own video presentation, Pacheco asserted that PRO Currency had investment value because of its unique usability:

> [C]ryptocurrency in today's [multi-level marketing] era is just – it's just huge … And right now, cryptocurrency, folks, it's in the infancy stages, but it's no longer the future; it's the here and now … So let's talk about what's relevant to everybody here today, which is the new way of acquiring cryptocurrency without having to do the heavy lifting, without having to mine out, without having to geek out on the subject and just learn all the technical aspects of it.
>
> ***
>
> Because right now, folks, about 90 percent or 95 percent of all the cryptocurrencies that are out there exist only for speculation, and we're not that.  So [IPro] is ***both the speculation plus the usability*** and creating the marketplace so that people can actually use their cryptocurrency. (Emphasis added.)
>
> ***
>
> It is connecting people through business, through ecommerce, through our network with cryptocurrency.  And this is huge because it solves the biggest challenge that the majority of cryptocurrencies have, which is acceptance.
>
> ***
>
> The [IPro] business program allows people to get paid 70 percent via currency or cash and 30 percent in crypto.

55.     Consistent with this, IPro and Pacheco claimed to be developing an e-commerce platform in which vendors and suppliers would engage in the sale of goods and services with consumers through transactions paid for with PRO Currency coins.

56.     To accomplish that goal of developing an ecosystem for the use of PRO Currency, Pacheco claimed that he was:  (i) working to attract vendors and retailers who would accept PRO Currency when transacting sales on the IPro e-commerce platform; (ii) developing a mobile software application that IPro members could use to buy goods and services, and thus earn additional Points convertible into PRO Currency; (iii) buying millions of dollars of retail product inventory that he intended to supply to IPro members, who would then create and stock online stores that

COMPLAINT                                            11

accepted PRO Currency as payment; and (iv) organizing live and online events that promoted IPro's packages and touted the many ways IPro members could earn additional Points convertible into PRO Currency.

57.     Further, IPro and Pacheco also arranged for PRO Currency to be listed on several cryptocurrency exchanges.  This enabled secondary trading in PRO Currency, which also enhanced the usability, accessibility, and value of the coin.

58.     It was additionally important for PRO Currency to be listed on cryptocurrency exchanges because the exchange-traded price of PRO Currency established a price point for IPro to use whenever purchasers of IPro packages requested that their rewards (set in dollar amounts) be converted into PRO Currency.

59.     Pacheco and IPro consequently took steps to encourage speculation in PRO Currency by:  (i) placing time and volume restrictions on IPro members' ability to convert points into PRO Currency in order to support its market price; and (ii) endorsing the market's valuation of PRO Currency by using its market price as the basis for calculating the PRO Currency coins awarded to IPro members redeeming their rebate rewards and/or recruitment bonuses.

60.     In sum, as demonstrated by IPro's marketing materials, the purchasing decisions made by its members, and the structure of IPro's recruitment-based iPN Compensation Plan, investors purchased IPro's package so that they could generate passive income by:  (i) recruiting new members, who recruit additional new members, who recruit yet more new members, therefore entitling that IPro member to progressively larger recruitment bonuses; and (ii) converting rebate rewards and recruitment bonuses in order to amass PRO Currency coins, a cryptocurrency whose value might rise on cryptocurrency exchanges as a result of IPro's marketing efforts.

**B.    Fraudulent Misuse of Investor Proceeds**

61.     The IPro investment program was heavily subscribed, quickly raising at least $26.5 million through the sale of IPro packages from January 2017 through March 2018.

62.     Pacheco and IPro sold packages to investors online and in-person.

63.     Pacheco controlled and had signatory authority for all of IPro's financial accounts, and he used that authority to engage in the rampant misuse of these investor proceeds.

64.     Pacheco represented to IPro members that for an activation fee, they would be paid recruitment bonuses in accordance with IPro's iPN Compensation Plan.

65.     IPro's iPN Compensation Plan historically required it to pay out recruitment bonuses in an amount that ranged from 58% to 65% of all incoming revenue from the sale of IPro packages, depending on the month.

66.     Because 70% of recruitment bonuses were paid by IPro in cash (with the remaining 30% convertible to PRO Currency), IPro was required to set aside 41.5-45.5% of all incoming funds for the payment of commissions and bonuses.

67.     Contrary to IPro's iPN Compensation Plan, however, from January 2017 through August 2018, only 29.3% of all incoming funds were paid out to IPro members as commissions and bonuses, falling far short of the 41.5-45.5% that IPro was obligated to pay out.

68.     Conversely, if IPro spent more than 54.5-58.5% of all incoming funds on other expenses, insufficient funds would be left for IPro to honor its commitments to IPro members.  That is precisely what happened here.

69.     From January 2017 through August 2018, Pacheco incurred expenses on about 68% of investor proceeds – more than $18 million – for reasons other than the payment of commissions and bonuses pursuant to the iPN Compensation Plan.

70.     Among other things, Pacheco:

- Spent roughly $2.5 million in IPro funds to purchase a luxury home in Redlands, California in an all-cash transaction;

- Caused about $1.925 million in IPro funds to be transferred to Accept Success Corporation, an entity held in his daughter's name

which Pacheco nonetheless controlled;

- Caused another approximate $2 million to be transferred to E Profit Systems LLC and another limited liability company under Pacheco's control, of which approximately $600,000 was unjustly retained; and

- Used about $150,000 in IPro funds to buy a Rolls Royce for his use.

71.   Pacheco's misallocation of resources left insufficient IPro funds available for the payment of commissions and bonuses owed to IPro investors.

72.   By March 2018, IPro was on the brink of collapse and ceased operations shortly thereafter.

**C.    IPro Was an Illegal Pyramid Scheme**

73.   A pyramid scheme is a type of fraud in which participants profit almost exclusively through recruiting other people to participate in the program.  A pyramid scheme is inherently fraudulent because it must eventually collapse.

74.   Pacheco engaged in a fraudulent pyramid scheme by soliciting IPro members through false and misleading means, including websites, promotional conferences, and in-person meetings, in which he touted the profit-making aspects of IPro's iPN Compensation Plan, while at the same time diverting IPro funds for his own benefit.

75.   Pacheco's misappropriation of proceeds raised from the sale of IPro packages consequently hastened the IPro pyramid scheme's inevitable collapse.

**D.    IPro's Sale of Its Packages Involved the Unregistered Sale of Securities**

76.    Federal securities laws require that companies disclose certain information through the registration of the offer or sale of securities with the SEC. This information allows investors to make informed judgments about whether to purchase a company's securities.

77.   Pacheco offered and sold IPro packages to the general public, including

to investors throughout the United States, and raised at least $26.5 million in investor proceeds in 2017 through March 2018.

78.     Pacheco's offer and sale of IPro packages was an offering of securities because the IPro packages involved:  (i) an investment in a pyramid scheme; and/or (ii) an investment in the PRO Currency digital assets, and therefore must be registered with the SEC unless an exemption applies.

79.     Pacheco's offer and sale of IPro packages was not registered with the SEC.

80.     No registration exemption applied to Pacheco's offer and sale of IPro packages.

### 1.     The Recruitment Bonus Component of the IPro Packages Constituted an Investment Contract

81.     Purchasers of IPro packages made an investment of money by paying a $50 activation fee in exchange for the right to receive passive income through IPro's iPN Compensation Plan recruitment bonus structure.

82.      Pacheco pooled all proceeds raised from IPro's sale of its packages in IPro's corporate accounts, and claimed to have spent a portion of those proceeds to support the growth of the IPro MLM network.

83.     Individual IPro members, *i.e.*, purchasers of the IPro packages who sought to participate in its iPN Compensation Plan by recruiting others, depended on Pacheco's maintenance and expansion of the IPro network in order for them to receive the recruitment bonuses owed to them under the compensation plan.

84.     Further, since recruitment bonuses were partly convertible into PRO Currency, the expansion of the IPro network and any profits to be generated through an IPro member's participation in the network also depended on Pacheco's efforts to establish PRO Currency's "usability" and market value as a digital asset.

85.     To achieve this, Pacheco and IPro were responsible for:  acquiring a supply of PRO Currency to distribute to others; developing a mobile-device

application that would disseminate PRO Currency to even more users as shopping rebates; developing an e-commerce platform in which services and goods would be sold in exchange for PRO Currency; and organizing live and online events promoting the Packages and their incorporated PRO Currency rebate rewards and recruitment bonuses.

86.     Unless IPro succeeded in the efforts described above, PRO Currency would lack value and be unusable, a significant selling point for IPro's packages would be lost, and participants in the IPro network's iPN Compensation Plan would have been substantially hindered in their attempt to recruit others to IPro, and thereby receive passive income in the form of a recruitment bonus.

### 2. The Points Convertible into PRO Currency Component of the IPro Packages Constituted an Investment Contract

87.     To receive rebate rewards or recruitment bonuses in the form of points that were convertible into PRO Currency, IPro members had to purchase IPro packages and pay a $50 activation fee, which constituted an investment of money.

88.     Proceeds from IPro's sale of packages were pooled together in IPro's corporate accounts, and Pacheco claimed that he used these funds in part to finance his efforts to support the growth and acceptance of PRO Currency by enhancing its usability.

89.     Purchasers of IPro packages were led to believe that the PRO Currency component of the package would increase in value as IPro and Pacheco "connect[ed] people through business, through ecommerce, through our network with cryptocurrency," by developing an e-commerce platform in which retailers and vendors would accept PRO Currency as a form of payment.

90.     Among other things, Pacheco claimed to be:  (i) finding retailers and vendors willing to transact in PRO Currency; (ii) stocking inventory for use by IPro members interested in establishing an e-commerce site of their own that would accept PRO Currency as payment; and (iii) developing a mobile software application that

IPro members could use to buy and sell goods and in doing so, earn additional points convertible into PRO Currency.

91.     Pacheco and IPro were accordingly responsible for promoting, developing, and creating an ecosystem in which PRO Currency would be usable, without which, the PRO Currency coin would have no value.

92.     Pacheco was an active participant and had a necessary role in IPro's unregistered securities offering.  He controlled IPro, he was its public face, and Pacheco extensively promoted the IPro packages online and during in-person events.

**E.     Pacheco's Role in IPro's Fraudulent Securities Offering**

93.     Pacheco ran IPro and controlled the transfer of funds in and out of its corporate accounts.

94.     Pacheco paid PRO Commerce to develop a purportedly proprietary cryptocurrency, PRO Currency, and established the means for broadly distributing that digital asset to the public through IPro's offer and sale of its packages.

95.     Pacheco approved the design and structure of IPro's iPN Compensation Plan.

96.     Pacheco knew, or was reckless in not knowing, that by misappropriating and misallocating vast sums of IPro corporate funds, IPro would have insufficient funds to meet its recruitment bonus obligations under the iPN Compensation Plan to IPro members.

97.     Pacheco knew, or was reckless in not knowing, that his misappropriation and misallocation of vast sums of IPro corporate funds rendered the representations he made in IPro's iPN Compensation Plan false and misleading.

98.     Pacheco knew, or was reckless in not knowing, that his misappropriation and misallocation of vast sums of IPro corporate funds would result in the collapse of the IPro pyramid scheme.

**F.    The Relief Defendants' Receipt of Investor Funds**

        **1.    IPro's Dispute with Fintact**

99.    Approximately half of the $26.5 million raised by IPro was processed through Fintact Payment Solutions LLC, Fintact Solutions Group LLC (collectively, "Fintact"), and its principal, relief defendant Matthew Lopez ("Lopez").

100.    Fintact did not have a state license to conduct business as a payment processor.

101.    Fintact nonetheless collected funds from purchasers of the IPro packages, paid the cash amount of the recruitment bonuses due to those purchasers, and also paid other expenses incurred by IPro, before forwarding the remainder of those IPro funds to IPro after deducting its own fee.

102.    Fintact, however, failed to transfer to IPro millions of dollars of the funds it had received from purchasers of the IPro packages, and Lopez caused a portion of those funds to be transferred to three limited liability companies controlled by him, relief defendants Maritus Regalis LLC, Gabtta LLC, and Trident Commerce LLC, as well as to Lopez's personal financial accounts.

103.    By autumn 2017, Fintact was no longer processing payments for IPro packages and ceased doing business with the company.

104.    In February 2018, IPro filed a civil action against Fintact in the U.S. District Court for the Southern District of Texas.

105.    In July 2018, IPro voluntarily dismissed its lawsuit against Fintact.  On information and belief, IPro has not refiled its suit nor has it undertaken any substantial efforts to recover its investors' funds.

        **a.    Relief defendant Lopez**

106.    From May to August 2017, Fintact transferred approximately $210,000 in investor funds to Lopez's personal financial accounts.

107.    In March and May 2017, Fintact transferred about $40,000 in investor funds to an automobile dealership for the purchase and maintenance of a car for

Lopez.

108.   Because these investor proceeds were raised through an unregistered, fraudulent securities offering, and because Lopez has no entitlement to those funds, Lopez obtained  an ill-gotten gain under circumstances in which it is not just, equitable, or conscionable for him to retain those funds.

### b.    Relief defendant Maritus Regalis LLC

109.   In August 2017, Fintact transferred approximately $3.3 million in investor funds to Maritus Regalis LLC, an entity that Lopez controlled.

110.   In October 2017, Maritus Regalis LLC transferred $2 million to Pacheco-controlled limited liability companies, one of which was relief defendant E Profit Systems LLC.

111.   Because Maritus Regalis LLC received $1.3 million in investor proceeds that were raised through an unregistered, fraudulent securities offering, and because Maritus Regalis LLC has no entitlement to those funds, Maritus Regalis LLC obtained an ill-gotten gain under circumstances in which it is not just, equitable, or conscionable for it to retain those funds.

### c.    Relief defendant Gabtta LLC

112.   In August 2017, Fintact transferred approximately $1.2 million in investor funds to Gabtta LLC, an entity that Lopez controlled.

113.   Because Gabtta LLC received those investor proceeds that were raised through an unregistered, fraudulent securities offering, and because Gabtta LLC has no entitlement to those funds, Gabtta LLC obtained an ill-gotten gain under circumstances in which it is not just, equitable, or conscionable for it to retain those funds.

### d.    Relief defendant Trident Commerce LLC

114.   In August 2017, Fintact transferred approximately $1 million in investor funds to Trident Commerce LLC, an entity that Lopez controlled.

115.   Because Trident Commerce LLC received those investor proceeds that

were raised through an unregistered, fraudulent securities offering, and because Trident Commerce LLC has no entitlement to those funds, Trident Commerce LLC obtained an ill-gotten gain under circumstances in which it is not just, equitable, or conscionable for it to retain those funds.

### e.    Relief defendant EProfit Systems LLC

116.   In August 2017, Fintact transferred approximately $3.3 million in investor funds to Maritus Regalis LLC, an entity that Lopez controlled.

117.   In October 2017, Maritus Regalis LLC transferred $2 million to Pacheco-controlled limited liability companies.

118.    As part of those transfers, Maritus Regalis LLC transferred $1 million to EProfit Systems LLC, an entity controlled by Pacheco, in October 2017.

119.   EProfit Systems LLC subsequently transferred approximately $400,000 back to IPro between August 2018 and January 2019.

120.   The approximately $600,000 in investor funds that EProfit Systems LLC retained were raised through an unregistered, fraudulent securities offering.  Because EProfit Systems LLC has no entitlement to those funds, EProfit Systems LLC obtained an ill-gotten gain under circumstances in which it is not just, equitable, or conscionable for it to retain those funds.

### FIRST CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)**

**(against Defendant Pacheco)**

121.   The SEC realleges and incorporates by reference paragraphs 1 through 120 above.

122.   Defendant Pacheco engaged in a fraudulent scheme in which he raised $26.5 million through the sale of IPro packages to investors who sought to profit from those packages by:  (i) participating in a recruitment compensation plan constructed by Pacheco in which IPro represented that they would receive profits

through the recruitment of others to the IPro program; and (ii) receiving, in exchange for their investment of money, rebate rewards and recruitment bonus compensation convertible into a cryptocurrency, PRO Currency, which they hoped would appreciate in value through Pacheco's efforts to establish an e-commerce platform in which sales would be transacted in PRO Currency.  IPro, however, was a fraudulent pyramid scheme and in addition, Pacheco's knowing, reckless, and unreasonable misappropriation and misallocation of substantial amounts of IPro's corporate funds rendered IPro unable to meet its obligations under its iPN compensation plan.

123.   By engaging in the conduct described above, Defendant Pacheco, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

124.   Defendant Pacheco, with scienter, employed devices, schemes and artifices to defraud; and engaged in acts, practices or courses of conduct that operated as a fraud on the investing public by the conduct described in detail above.

125.   By engaging in the conduct described above, Defendant Pacheco violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Sections 17(a)(1) and (3) of the Securities Act

### (against Defendant Pacheco)

126.   The SEC realleges and incorporates by reference paragraphs 1 through 120 above.

127.   Defendant Pacheco engaged in a fraudulent scheme in which he raised

$26.5 million through the sale of IPro packages to investors who sought to profit from those packages by: (i) participating in a recruitment compensation plan constructed by Pacheco in which IPro represented that they would receive profits through the recruitment of others to the IPro program; and (ii) receiving, in exchange for their investment of money, rebate rewards and recruitment bonus compensation convertible into a cryptocurrency, PRO Currency, which they hoped would appreciate in value through Pacheco's efforts to establish an e-commerce platform in which sales would be transacted in PRO Currency. IPro, however, was a fraudulent pyramid scheme and in addition, Pacheco's knowing, reckless, and unreasonable misappropriation and misallocation of substantial amounts of IPro's corporate funds rendered IPro unable to meet its obligations under its iPN compensation plan.

128. By engaging in the conduct described above, Defendant Pacheco, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

129. Defendant Pacheco, with scienter, employed devices, schemes and artifices to defraud; and, with scienter or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

130. By engaging in the conduct described above, Defendant Pacheco violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

## THIRD CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (against Defendant Pacheco)

131.   The SEC realleges and incorporates by reference paragraphs 1 through 120 above.

132.   Defendant Pacheco directly or indirectly offered and sold IPro's securities in offerings that are not registered with the SEC and that are not subject to a valid exemption to registration.

133.   By engaging in the conduct described above, Defendant Pacheco, directly or indirectly, singly and in concert with others, has made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

134.   By engaging in the conduct described above, Defendant Pacheco has violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Sections 5(a) and 5(c), 15 U.S.C. §§ 77e(a) & 77e(c).

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment

### (against Relief Defendants EProfit Systems LLC, Maritus Regalis LLC, Gabtta LLC, Trident Commerce LLC, Lopez, Fintact Solutions Group LLC, and Fintact Payment Solutions LLC)

135.   The SEC realleges and incorporates by reference paragraphs 1 through 120 above.

136.   Relief defendant EProfit Systems LLC received and then retained

approximately $600,000 in proceeds from the sale of IPro packages, funds over which it has no legitimate claim.

137.   Relief defendant EProfit Systems LLC obtained the ill-gotten gains described above as part of the securities law violations alleged above, under circumstances in which it is not just, equitable, or conscionable for him to retain the funds.

138.   By engaging in the foregoing conduct, EProfit Systems LLC has been unjustly enriched and must disgorge its ill-gotten gains.

139.   Relief defendants Lopez, Fintact Solutions Group LLC, Fintact Payment Solutions LLC, Maritus Regalis LLC, Gabtta LLC, and Trident Commerce LLC received approximately $3.5 million in proceeds from the sale of IPro packages, funds over which they have no legitimate claim.

140.   Relief defendants Lopez, Fintact Solutions Group LLC, Fintact Payment Solutions LLC, Maritus Regalis LLC, Gabtta LLC, and Trident Commerce LLC obtained the ill-gotten gains described above as part of the securities law violations alleged above, under circumstances in which it is not just, equitable, or conscionable for him to retain the funds.

141.   By engaging in the foregoing conduct, Lopez, Fintact Solutions Group LLC, Fintact Payment Solutions LLC, Maritus Regalis LLC, Gabtta LLC, and Trident Commerce LLC have been unjustly enriched and must disgorge their ill-gotten gains.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendant Pacheco committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of

Civil Procedure, permanently enjoining Defendant Pacheco, and his agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Pacheco and his agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

### IV.

Order Defendant and Relief Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

### V.

Order Defendant Pacheco to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  May 22, 2019

/s/ Gary Y. Leung
_____
GARY Y. LEUNG
PETER DEL GRECO
Attorneys for Plaintiff
Securities and Exchange Commission